**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                    Case No.: 3:14-cr-148-J-34MCR

DESHORIE EVADNE GRANT

_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on the Government's Motion for entry of

an order allowing the involuntary medication of the Defendant to restore her to

competency for trial (the "Motion") (Doc. 55), brought before an evidentiary

hearing held on August 3, 2015 ("*Sell* Hearing").  The Defendant opposes the

Motion.  The matter is now ripe for consideration.  For the reasons stated herein,

the undersigned recommends that the Motion be **DENIED**.

## I.    Background

On September 4, 2014, the grand jury returned a ten-count indictment

against the Defendant charging her with knowingly and willfully submitting false

statements on Postal Service Forms 3575 to the United States Postal Service in

violation of 18 U.S.C. §§ 1001(a)(3) and 924(e).  (Doc. 1.)  In other words, the

Defendant allegedly obtained and used United States Postal Service ("USPS")

---

[1] "Within 14 days after being served with a copy of the recommended disposition [of a motion to involuntarily medicate], . . . a party may serve and file specific written objections to the proposed findings and recommendations."  Fed. R. Crim. P. 59(b)(2).  "Failure to object in accordance with this rule waives a party's right to review." *Id.*; *see also* 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1; Local Rule 6.02.

"Change of Address" forms to forward the mail sent to various entities to her residence.  The entities whose addresses the Defendant allegedly changed include, among others, U.S. Military Retired Pay, Defense Finance Accounting Service, Fifth Third Bank, GEICO, Western Union, and the U.S. Treasury Department.

On September 15, 2014, the Defendant's former attorney retained Dr. Jason Demery for an evaluation to determine the Defendant's competency to proceed.  (Doc. 29.)  On September 29 and October 7, 2014, Dr. Demery evaluated the Defendant at the Baker County Detention Facility in Macclenny, Florida.  (*Id.*)  Thereafter, Dr. Demery opined that the Defendant was incompetent to proceed because she was incapable of properly assisting defense counsel. (*Id.*)  On October 23, 2014, the Defendant's former attorney filed a Notice of Suggestion of Mental Incompetence.  (*Id.*)

On November 18, 2014, a competency hearing was held before the undersigned.  (Doc. 34.)  At that time, the parties filed a Stipulation Regarding Incompetency agreeing as to the Defendant's incompetency to proceed.  (Doc. 35.)  On November 20, 2014, the undersigned entered an Order adopting the parties' Stipulation Regarding Incompetency and finding the Defendant incompetent to stand trial.  (Doc. 39.)  Pursuant to 18 U.S.C. §§ 4241(d) and 4247(b), the undersigned further ordered the Defendant to be committed for treatment and a psychiatric or psychological examination by a designated

licensed or certified psychiatrist or psychologist for a reasonable period of time, but not to exceed four (4) months.  (*Ia.*)

The Defendant was admitted to the Federal Medical Center in Carswell, Texas ("FMC Carswell") on December 16, 2014.  (Doc. 55 at 2.)  There, she was evaluated and treated by various providers, including Staff Forensic Psychologist Dr. Ashley Noble and Staff Psychiatrist Dr. Jose Silvas.  (*Ia.*)

On April 21, 2015, the undersigned received correspondence from Warden Jody Upton requesting a thirty-day extension to evaluate the Defendant due to an administrative hearing that was scheduled with the Defendant for purposes of establishing her willingness to resume taking medication, which she previously refused to take as directed.  (Doc. 43.)  On April 25, 2015, the undersigned entered an Order granting the Federal Bureau of Prisons' extension request.  (*Ia.*) The Bureau of Prisons was provided until May 15, 2015, to evaluate the Defendant and until June 1, 2015, to submit a written report to the Court regarding the Defendant's competency status.  (*Ia.*)

On May 27, 2015, Dr. Noble issued a report noting that the Defendant refused to take psychiatric medication on a voluntary basis.  (*Ia.*)  Dr. Noble opined that she was incompetent to stand trial and that it was unlikely that she would be restored to competency without being treated with psychotropic medication.  (*Ia.* at 2-3.)  The undersigned held a status conference on June 2, 2015, whereby Dr. Noble's report and the Defendant's competency were

3

discussed.  (Doc. 54.)  At that time, the Government advised as to its intention to file the Motion.  (*Id.*)  On June 12, 2015, the Government filed the Motion requesting a *Sell* hearing to determine whether the Defendant could be medicated involuntarily.  (Doc. 55.)

The *Sell* hearing was held before the undersigned on August 3, 2015. (Doc. 79.)  Drs. Noble and Silvas testified via videoconference on behalf of the Government.  The Government introduced Dr. Demery's report, Dr. Noble's report, and a proposed treatment plan prepared by Dr. Silvas into evidence. (Doc. 84 at 3.)  Neuropsychologist Dr. Robyn Jones Cohen, who evaluated the Defendant on July 17, 2015, testified live at the *Sell* hearing on the Defendant's behalf.  (Doc. 84 at 61-88.)  Drs. Noble, Silvas, and Cohen were recognized as experts in their respective fields.

At the *Sell* hearing, Dr. Noble testified that he diagnosed the Defendant with delusional disorder, persecutory type with bizarre content.  (Doc. 84 at 8.) Dr. Noble stated that he met with the Defendant approximately 16 to 20 times, discussed with her the mental diagnosis, and discussed how taking psychotropic medication could assist her in regaining competency.  (*Id.* at 10.)  He also stated that the Defendant did not believe that she had a mental illness or any psychological symptoms that would benefit from taking psychotropic medication. (*Id.*)  Dr. Noble referred the Defendant to Dr. Silvas for further treatment involving the potential use of psychotropic medication.  (*Id.* at 32.)

4

Dr. Silvas testified that he met with the Defendant and explained to her that the diagnosis had been determined by Dr. Noble. (*Id.* at 33.)  Dr. Silvas further explained to the Defendant that her proposed treatment included the use of psychotropic medication.  (*Id.* at 34.)  Moreover, Dr. Silvas advised the Defendant as to the benefits of voluntary, oral use of psychotropic medication as opposed to involuntary injection of psychotropic medication.  (*Id.*)  After her discussion with Dr. Silvas, the Defendant initially agreed to take psychotropic medication voluntarily.  (*Id.* at 35.)  Dr. Silvas reported that she took 20 milligrams of the psychotropic medication called Geodon for three days, but that she complained of side effects, including blurred vision, feeling tired, and difficulty with urination.  (*Id.* at 36, 43-44.)  Subsequently, the Defendant refused to take medication.

Both Drs. Noble and Silvas opined that there is a substantial likelihood of restoring the Defendant to competency through the involuntary administration of psychotropic medication.  (*Id.* at 11-13, 35-36.)  As a basis for their opinions, Drs. Noble and Silvas relied on a peer-reviewed 2007 study published in the Journal of American Academy of Psychiatry and the Law, authored by Dr. Byron Herbel and Dr. Hans Stelmach.   (*Id.* at 11-13, 42.)  This study, entitled *Involuntary Medication Treatment for Competency Restoration of 22 Defendants with Delusional Disorder*, took place at the Federal Medical Center in Butner, North Carolina (the "Herbel Study").  (*Id.* at 42.)  The Herbel study concluded that seventeen (17) out of twenty-two (22) defendants (roughly 77%) diagnosed with

delusional disorder were restored to competency after the administration of psychotropic medication. (*Id.* at 11-12.) However, Drs. Noble and Silvas both conceded that few studies exist about restoring individuals with delusional disorder to competency for the purposes of trial. (*Id.* at 18-19, 42.)

Drs. Noble and Silvas also opined that, based on the Defendant's refusal to take medication, there existed no other less intrusive methods to restore her to competency. (*Id.* at 13-16, 41-42.) They specifically discounted cognitive behavioral therapy as a potentially less intrusive method. (*Id.*) In terms of the proposed treatment plan, Dr. Silvas explained that he would continue to afford the Defendant the opportunity to take psychotropic medication voluntarily. (*Id.* at 37-38, 40-41.) If the Defendant continued to refuse medication, then Dr. Silvas would recommend involuntarily injecting the Defendant with one of two psychotropic medications, Haloperidol or Prolixin.[2] (*Id.* at 45.) In order to alleviate the concerns for significant side effects and inability of the Defendant to assist in her defense of the case, Dr. Silvas recommended initially administering a very low dosage of the medication.[3] (*Id.* at 57.) He also recommended the opportunity to try both medications, to adjust dosages, and to simultaneously

---

[2] Dr. Silvas eliminated the medication Risperdal as a potential treating medication as a result of the Defendant informing him of a history of concern for side effects with Risperdal. (*Id.* at 45-47.)

[3] Dr. Silvas stated, for example, that he would start with 25 milligrams of Haloperidol once per month, which is half of the standard starting dose. (*Id.* at 57.)

prescribe side effect medications.  (*Id.* at 38-41, 45.)   Dr. Silvas requested a minimum 6-month period of treatment with psychotropic medication to restore the Defendant to competency "to allow for the adjustment of the doses to be effective and to allow for any complications of side effects."  (*Id.* at 40-41; Gov't Ex. 3 at 2.)

Dr. Cohen, the Defendant's expert witness, is a neuropsychologist at Cohen & Jones Neuropsychology Services, LLC in Apopka, Florida, and Division Chief of Neuropsychology Consultants at Arnold Palmer Hospital in Orlando, Florida, and examined the Defendant on July 17, 2015.  (Def. Ex. 1 and 2.)  Upon examination of the Defendant, Dr. Cohen concurred with Dr. Noble's diagnosis of delusional disorder, persecutory type bizarre content.  (*Id.* at 64.)  Dr. Cohen testified that she was not in favor of involuntary medication in this particular case as a result of the Defendant's distrust of the staff at FMC Carswell and that involuntary medication could exacerbate the Defendant's persecutory delusions. (*Id.* at 67.)  She further testified that psychotropic medication was less effective in treating delusions and recommended a less intrusive method of treatment in the form of cognitive behavioral therapy, with an ultimate goal of obtaining the Defendant's consent to voluntary treatment with medication.  (*Id.* at 67, 71-73.)

## II.    Analysis

A mentally ill defendant "has a 'significant' constitutionally protected 'liberty interest' in 'avoiding the unwanted administration of antipsychotic drugs.'" *Sell v. United States*, 539 U.S. 166, 178 (2003) (quoting *Washington v. Harper*, 494 U.S.

210, 221 (1990)).  However, this liberty interest can be overcome if: (1) important governmental interests are at stake; (2) involuntary medication will significantly further those governmental interests; (3) involuntary medication is necessary to further those interests; and, (4) administration of the medication is medically appropriate (*i.e.*, in the defendant's best medical interest in light of his or her medical condition).  *Id.* at 180-81.  "'The *Sell* factors do not represent a balancing test, but a set of independent requirements, each of which must be found true before the forcible administration of psychotropic drugs may be considered constitutionally permissible.'" *United States v. Gillis*, Case No.: 3:11-cr-18-J-34JBT, 2011 WL 7109362 at *1, 3 (M.D. Fla. Nov. 30, 2011), report and recommendation adopted as modified by 2012 WL 254019 at *2 (M.D. Fla. Jan. 27, 2012) (quoting *United States v. Ruiz-Gaxiola*, 623 F.3d 684, 691 (9th Cir. 2010)).

Prior to considering the *Sell* factors, a court "should ordinarily determine whether the Government seeks, or has first sought, permission for forced administration of drugs on [the grounds set forth in *Harper*]; and, if not, why not." *Sell*, 539 U.S. at 183.  In *Harper*, the United States Supreme Court held that an inmate with a "serious mental illness" may be treated "with antipsychotic drugs against his will, if the inmate is dangerous to himself or others and the treatment is in the inmate's medical interest."  *Harper*, 494 U.S. at 227.

At the hearing, Dr. Noble testified that the FMC Carswell staff held a

8

hearing in May 2015 specifically to determine whether the Defendant may be treated with psychotropic drugs against her will within the context of *Harper*. (Doc. 84 at 10-11.)  Dr. Noble and the Defendant were both present at this hearing.  (*Id.*)  Dr. Noble testified that the "main purpose of that [] hearing [wa]s to [] make a determination whether [the Defendant] [wa]s a danger to herself, a danger to other people, or presents with a grave disability of some kind."  (*Id.* at 11.)  It was determined by the FMC Carswell staff that the Defendant "did not meet any of those criteria."  (*Id.*)  Given this evidence, it is clear that involuntary administration of psychotropic medication is not justified pursuant to *Harper*, and the *Sell* factors provide the proper analysis.

The Supreme Court did not articulate the standard of proof that applies when considering the *Sell* factors.  However, the Eleventh Circuit held that the relevant findings must be supported by clear and convincing evidence.  *See United States v. Diaz*, 630 F.3d 1314, 1332 (11th Cir. 2011).  Accordingly, the undersigned applies the "clear and convincing" evidence standard in addressing the *Sell* factors.

## A.   Important Government Interest

The Government argues that it has an important interest in bringing the Defendant to trial because she is charged with a serious crime and should be accountable for her actions.  (Doc. 84 at 89-91.)  In support of its argument, the Government references that its investigation revealed that the Defendant filed

sixty-one (61) separate "Change of Address" forms and that there were approximately 103 identifiable victims of serious property violations.  (*Id.* at 90.) The Government also asserts that the Defendant faces a maximum 50-year sentence based on the maximum penalty of five (5) years per each of the ten (10) counts.  (*Id.*)  The undersigned agrees that the Government has an important interest in prosecuting this case because the crime with which the Defendant is charged is "serious."  However, the undersigned finds that special circumstances exist in this case which significantly undermine the Government's interest in prosecuting the Defendant.  Therefore, the undersigned concludes that the Government failed to satisfy its burden of demonstrating by clear and convincing evidence that its interest in prosecuting the Defendant outweighs her constitutionally protected liberty interest in freedom from forcible medication.

### 1.    Serious Crime

"The Government's interest in bringing to trial an individual accused of a serious crime is important."  *Sell*, 539 U.S. at 180.  "The Supreme Court recognized the Government's role in prosecuting serious crimes 'to protect through application of the criminal law the basic human need for security.'" *Gillis*, 2011 WL 7109362 at *5 (quoting *Sell*, 539 U.S. at 180).

The circuits appear to be somewhat split as to whether district courts should consider the maximum penalty, the sentencing guideline range, or a combination of both in assessing whether a crime is serious pursuant to *Sell*.

10

*Compare United States v. White*, 620 F.3d 401, 410-11 (4th Cir. 2010)

(considering only the maximum penalty); *United States v. Green*, 532 F.3d 538,

549 (6th Cir. 2008) (same); *United States v. Palmer*, 507 F.3d 300, 304 (5th Cir.

2007) (indicating that the maximum penalty, rather than the guideline range is the

appropriate consideration to determine whether a crime is serious) *with United*

*States v. Hernandez-Vasquez*, 513 F.3d 908, 919 (9th Cir. 2008) (stating that "the

likely guideline range is the appropriate starting point for the analysis of a crime's

seriousness"); *United States v. Valenzuela-Puentes*, 479 F.3d 1220, 1226 (10th

Cir. 2007) (considering both the maximum penalty and the "likely" guideline

range).  However, it appears that district courts within the Eleventh Circuit give

significant weight to the maximum penalty that a defendant faces in making such

assessment.  *See, e.g., United States v. Ruark*, Case No.: 1:10-cr-160-ODE-

GGB, 2014 WL 4966913 at *7 (N.D. Ga. Oct. 2, 2014) ("Although *Sell* gives scant

guidance for determining the seriousness of a crime, the statutory maximum

penalty authorized for the charged offense is a helpful measure."), *aff'd*, Case

No.: 14-14469, 2015 WL 3387713 at *7 (11th Cir. May 27, 2015) (per curiam);

*Gillis*, 2011 WL 7109362 at *5 ("Here, in the absence of controlling Eleventh

Circuit authority and noting that the guidelines are only advisory, the undersigned

applies the 'maximum penalty' test in determining that the crime with which [the]

[d]efendant is charged is serious."); *United States v. Brauner*, Case No.: 08-

20059-cr-GOLD, 2008 WL 2635527 at *1 (S.D. Fla. June 30, 2008) (noting that

11

the alleged crime "carries a statutory maximum term of imprisonment of twenty (20) years," making it a "serious crime").

Here, the Defendant faces a maximum 50-year sentence if convicted of all ten (10) counts against her for submitting false USPS "Change of Address" forms. Moreover, the Defendant allegedly filed sixty-one (61) separate "Change of Address" forms that affected approximately 103 identifiable victims.  Without drawing any bright lines, the undersigned concludes that the charges against the Defendant are serious.

### 2.    Special Circumstances

Although the undersigned determines that the Government has an important interest in prosecuting serious crimes, the inquiry continues under *Sell* to determine whether "[s]pecial circumstances" undermine the importance of that interest.  *Sell*, 539 U.S. at 180.  A court "must consider the facts of the individual case in evaluating the Government's interest in prosecution."  *Id.*  Special circumstances that may diminish the importance of that interest include the possibility of civil commitment amounting to a lengthy confinement, which could "diminish the risks that ordinarily attach to freeing without punishment one who has committed a serious crime," or "the possibility that the defendant has already been confined for a significant amount of time (for which he would receive credit toward any sentence ultimately imposed . . .)."  *Id.*; *see also United States v. Bradley*, 417 F.3d 1107, 1116 (10th Cir. 2005) (stating "[a]s we read *Sell*, this . . .

12

example suggests that when the amount of time the defendant is confined

pending determination of competency is in parity with an expected sentence in

the criminal proceeding, the Government may no longer be able to claim an

important interest in prosecution").  Courts also consider other circumstances,

such as the nature of the alleged crime, public safety concerns, and the

information available regarding a defendant's medical condition.  *See, e.g.,*

*White*, 620 F.3d at 419-22 (considering additional circumstances such as the

nature of the alleged crime, public safety concerns, and the lack of information

regarding the defendant's medical condition); *Gillis*, 2011 WL 7109362 at *6

(recognizing that it is proper for a court to consider the nature of the alleged crime

in analyzing whether special circumstances undermine an important government

interest).

### a.    Prospect of Civil Commitment

During the *Sell* hearing, Dr. Noble testified that the Defendant has not been

evaluated to determine whether she meets the criteria for involuntary civil

commitment pursuant to 18 U.S.C. § 4246.  (Doc. 84 at 28-29.)  As such, the

undersigned can only speculate as to the likelihood of civil commitment and the

potential length of confinement resulting from such commitment.  The

undersigned finds that the mere possibility of civil confinement does not

undermine the Government's interest in prosecution.

## b.     Potential Credit for Time Served

However, the undersigned finds that other special circumstances exist

which substantially undermine the Government's interest in prosecuting the

Defendant.  One such circumstance is the Defendant's potential credit for time

served.  The Eleventh Circuit has recognized that the length of pretrial detention

may lessen the importance of the Government's interest "if an individual serves

time equal to or greater than his likely sentence if found guilty."  *Ruark*, 2015 WL

3387713 at *6.  Courts may reliably consider a defendant's likely sentence by

obtaining a calculation of advisory sentencing guidelines.  *See White*, 620 F.3d at

415 ("We may reliably consider [the defendant's] likely sentence . . . by actually

calculating the defendant's likely sentence vis-a-vis the advisory sentencing

guidelines."); *see also United States v. Sledge*, Case No.: 1:08-cr-9/RS-WCS,

2011 WL 635868 at *2 (N.D. Fla. Feb. 11, 2011) (relying on advisory sentencing

guidelines range to determine the defendant's likely sentence); *United States v.

Rodman*, 446 F. Supp. 2d 487, 496 n. 4 (D.S.C. 2006) (same).

Here, the Government calculated the Defendant's likely sentence under the

sentencing guidelines and relayed that information to the undersigned during the

*Sell* hearing.  According to the Government's calculation, the Defendant would be

subject to a ten (10) to sixteen (16) month sentencing range under the guidelines

if she were found guilty.[4]   (Doc. 84 at 96.)  The Defendant was taken into custody on or about September 23, 2014, and it appears that the Defendant has remained in pretrial confinement since that date.  (*Id.*, Doc. 19.)  Consequently, the Defendant has currently served over eleven (11) months in pretrial confinement. Her pretrial confinement is already greater than the minimum sentencing guidelines range of ten (10) months.

Additionally, Dr. Silvas requested a minimum 6-month period of treatment with psychotropic medication to restore the Defendant to competency "to allow for the adjustment of the doses to be effective and to allow for any complications of side effects."  (*Id.* at 40-41; Gov't Ex. 3 at 2.)  Therefore, the Defendant will, at a minimum, spend more than seventeen (17) months in pretrial confinement should the Court grant the Motion.  This period of confinement exceeds her likely sentencing range of ten (10) to sixteen (16) months.  Moreover, a 17-month confinement calculation does not take into account the likelihood of an appeal of a decision to involuntarily medicate, or any other factors that may increase the credit for time served.  *See, e.g., White*, 620 F.3d at 414-15 (taking into account pretrial confinement for appeal and good time credits for time served if convicted

--------

[4] As no presentence report has been prepared, the undersigned accepts the Government's calculation of the Defendant's likely sentence under the sentencing guidelines.  *See, e.g., United States v. Arendas*, Case No.: 1:10-cr-123 TS, 2013 WL 1896197 at *6 n. 47 (D. Utah May 6, 2013) (accepting the attorneys' estimates of the defendant's likely sentence under the sentencing guidelines where no presentence report had been prepared).

to determine whether pretrial confinement lessens an important government

interest); *United States v. Sledge*, Case No.: 1:08-cr-9/RS-WCS, 2011 WL

635868 at *2 (N.D. Fla. Feb. 11, 2011) ("If I were to order that [the defendant] be

involuntarily medicated, this would probably result in an appeal that would leave

[the defendant] in custody for an additional 6 to 12 months."); *United States v.*

*Arendas*, Case No.: 1:10-cr-123 TS, 2013 WL 1896197 at *6 (D. Utah May 6,

2013) (noting that additional time in confinement would be required for the

preparation of a presentence report and a sentencing hearing).

Because the Defendant will have served time greater than her likely

sentence if convicted, the undersigned finds that the importance of the

Government's interest in prosecuting the Defendant is substantially diminished.

*See, e.g., White*, 620 F.3d at 419 (finding the significance of the Government's

interest in prosecuting substantially diminished by the fact that the defendant

served more than a significant amount of time in light of her likely sentence);

*Sledge*, 2011 WL 635868 at *2 (finding the significance of the Government's

interest in prosecuting substantially lessened by the fact that the defendant's

custody exceeded the guidelines range); *Arendas*, 2013 WL 1896197 at *6

(finding the significance of the Government's interest in prosecuting outweighed

by the defendant's liberty interest because the length of his confinement was

"roughly equal to his likely sentence"); *Rodman*, 446 F. Supp. 2d at 496 ("In this

case, the Government's interest is significantly diminished because [the

defendant] has already been confined for almost the entire term to which he would be sentenced under the Sentencing Guidelines if convicted.").  Although a defendant who has served significant time in light of an expected sentence substantially diminishes the importance of a government interest, that fact alone does not defeat the interest in prosecuting a defendant.  *See, e.g., White*, 620 F.3d at 419; *Sledge*, 2011 WL 635868 at *3.  Thus, the undersigned must analyze whether other circumstances exist in this case that undermine the Government's interest in prosecuting the Defendant.

### c.    Nature of the Alleged Crime

It is proper for the Court to consider the nature of the alleged crime in analyzing whether other special circumstances exist.  *See, e.g., Gillis*, 2011 WL 7109362 at *6 (citing *White*, 620 F.3d at 413) (recognizing that it is proper to consider the nature of the alleged crime in analyzing whether special circumstances undermine an important government interest).  Specifically, courts consider whether the alleged crime committed was violent in nature.  *White*, 620 F.3d at 419; *Gillis*, 2011 WL 7109362 at *6; *Sledge*, 2011 WL 635868 at *3.  The undersigned finds that the nature of the Defendant's crimes lessens the Government's interest in prosecuting her because such alleged crimes were non-violent offenses.[5]  Assuming, *arguendo*, the Defendant's guilt, her crimes of

---

[5] Moreover, it is highly questionable that the Defendant possessed the requisite criminal intent to commit the alleged offenses.  The act of completing

(continued...)

17

submitting false "Change of Address" forms to forward the mail of various entities (*e.g.,* Fifth Third Bank, GEICO, and Western Union) to her residence did not cause physical harm to any individuals.  To the extent that the Government believes the Defendant poses a physical threat to any individuals connected with the entities, it has presented no evidence that the Defendant is capable of, or likely to commit, future crimes of physical violence.  Further, the alleged victims would not receive assurances that the Defendant will be detained for any length of time from a possible prosecution, since even if the Defendant is tried and convicted, she will likely be released on time served.

### d.    Public Safety Concerns

Similarly, the undersigned finds that minimal public safety concerns mitigate the Government's interest in prosecuting the Defendant.  As discussed above, her alleged activities were non-violent and the Government did not present any evidence that she was deemed by her treating doctors as a danger to herself or others.  Further, it appears that the Defendant's commitment for

---

[5](...continued)
sixty-one (61) change of address forms of random entities utilizing her personal home address is hardly a criminal scheme suggesting rational behavior.  *Cf. United States v. Morrison*, 415 F.3d 1180, 1186 (10th Cir. 2005) ("To be sure, regardless of confinement there is an important governmental interest in an adjudication regarding guilt.  But disposition of the criminal charge against [the defendant] may well not produce such a result [where the defendant] was entitled to an insanity defense.").  In fact, Dr. Cohen suggested such conduct may be indicative of the Defendant's delusional disorder.  (Doc. 84 at 86-87.)

evaluation at FMC Carswell will preclude her from engaging in certain violent activities such as owning firearms. *See, e.g., White*, 620 F.3d at 419-20. These circumstances lessen any public safety concerns and further reduce the Government's interest in additional proceedings against the Defendant.

### e.    Information Regarding Medical Condition

Finally, the undersigned finds that the dearth of information regarding the Defendant's medical condition lessens the Government's interest. Drs. Noble and Silvas relied solely on the Herbel study to conclude that involuntary treatment with psychotropic medication is substantially likely to render the Defendant competent to stand trial. However, the Herbel study is, "by its own terms, vulnerable to 'bias[] in favor of finding a positive response to treatment,' due to its experimental design." *United States v. Watson*, Case No.: 14-4388, 2015 WL 4385697 at *7 (4th Cir. July 17, 2015) (quoting Byron L. Herbel & Hans Stelmach, *Involuntary Medication Treatment for Competency Restoration of 22 Defendants With Delusional Disorder*, 35 J. Am. Acad. Psychiatry L. 47, 58 (2007)). Further, as acknowledged by the circuit court in *White*, none of the twenty-two (22) subjects in the Herbel study were female. 620 F.3d at 421. Because men and women react differently to medications, it is difficult for the undersigned to assume that the results of the Herbel study apply equally to women. *See id.* ("As men and women often react differently to medications, we cannot necessarily assume that the results of this study, inconclusive as they might be, apply to

19

women.") (internal citations omitted).[6]

## B.    Remaining *Sell* Prongs

In light of the factors discussed above, the undersigned finds that the Government has failed to satisfy its burden under the first prong of the *Sell* analysis.  Therefore, the undersigned finds it unnecessary to address the remaining *Sell* prongs.

## III.    Conclusion

For the foregoing reasons, the undersigned finds that the Government has failed to satisfy its burden of demonstrating by clear and convincing evidence that its interest in prosecuting the Defendant outweighs her constitutionally protected liberty interest in avoiding unwanted administration of psychotropic medication.

Accordingly, it is respectfully **RECOMMENDED**:

The Government's Motion (Doc. 55) be **DENIED**.

**DONE AND ENTERED** at Jacksonville, Florida, on August 27, 2015.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

---

[6] The undersigned is particularly concerned about how the psychotropic medication will affect the Defendant in light of the multiple reported concerns of complications from side effects, as well as Dr. Cohen's testimony that the psychotropic medications could exacerbate the Defendant's delusions.  (Doc. 84 at 37-41, 45-47, 49, 67.)

Copies to:

The Honorable Marcia Morales Howard
United States District Judge

Counsel of Record